IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
JUNE 18, 2008 Session

# IN RE: A.N.F. (d/o/b 10/24/99), a Child Under Eighteen Years of Age

**Direct Appeals from the Juvenile and General Sessions Courts for McNairy County**
**Nos. C-765 (Juvenile) & 7525 (General Sessions)**
**Bob Gray, General Sessions Court Judge**

---

**No. W2007-02122-COA-R3-PT - Filed September 24, 2008**

---

This opinion involves two consolidated appeals. The first case involves post-divorce petitions to modify a parenting plan, filed by the husband and the wife, regarding custody of two children. The second case was filed by the wife and a third party, seeking to establish the third party's parentage of one of the two children. For the following reasons, we affirm the trial court's decision in the custody case as modified, and we affirm the trial court's decision in the paternity case.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the General Sessions Court Affirmed as Modified; Judgment of the Juvenile Court Affirmed**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and WALTER C. KURTZ, SR., J., joined.

Betty Stafford Scott, Jackson, TN, for Appellants

Kelli Barr Summers, Brentwood, TN, for Appellee

## OPINION

### I. Facts & Procedural History

Mr. F and Mrs. F[1] were living together in 1999 when Mrs. F gave birth to a daughter, A.N.F. Mr. F and Mrs. F were not married at the time. According to Mrs. F, she was already pregnant when she met Mr. F, and Mr. F knew that A.N.F. was not his child. Nevertheless, when A.N.F. was born, Mr. F and Mrs. F brought her home from the hospital together and raised her as if Mr. F was her father. In 2000, when A.N.F. was eight months old, Mr. F and Mrs. F married. They executed a voluntary acknowledgment of paternity naming Mr. F as A.N.F.'s father. Mr. F was then listed as A.N.F.'s father on her birth certificate, and A.N.F.'s last name was changed from Mrs. F's maiden name to Mr. F's last name. In 2002, Mr. F and Mrs. F had a son, C.S.F.

In 2004, Mr. F filed a complaint for divorce. Among other things, he sought to be designated the primary residential parent of A.N.F. and C.S.F. Mrs. F filed an answer and counter-complaint also seeking to be named the primary residential parent. Mrs. F's counter-complaint stated that A.N.F. "was not fathered by [Mr. F], however, the minor child does have [Mr. F]'s last name and has known no other father."

The parties were divorced by decree in November of 2004. They could not reach an agreement regarding child custody, and the trial court entered a permanent parenting plan providing that Mr. F and Mrs. F would be designated "joint primary residential parents with equal parenting time" until A.N.F. enrolled in school. Once A.N.F. began school, Mr. F would be the primary residential parent, and the children would reside with Mrs. F every other weekend and every other Wednesday night. During summer vacation, the opposite schedule would apply, and the children would reside primarily with Mrs. F.

Shortly after the final decree, in February of 2005, Mrs. F contacted the Department of Children's Services ("DCS") and reported that A.N.F. told her she had been touched in her private area by Mr. F. A.N.F. was five years old at the time. A DCS case manager contacted Mr. F and told him that he was not permitted to pick his children up from Mrs. F's visitation. DCS filed a petition that resulted in an ex parte restraining order and no contact order being entered against Mr. F. A.N.F. was examined at a local emergency room for signs of sexual abuse, but none was found. Either the trial court or DCS also required that A.N.F. receive counseling.

Mr. F filed a "Petition for the Immediate Return of the Minor Children to Petitioner's Care and Petition to Modify Custody and Visitation." Mr. F alleged that Mrs. F had a history of making false allegations of sexual abuse, and he contended that Mrs. F's allegations about him abusing A.N.F. were false. He further alleged that Mrs. F was emotionally unstable, and that she was repeatedly making derogatory remarks about him in the presence of the children. Mrs. F allegedly told A.N.F. that Mr. F was not her "real" father, without consulting him, causing A.N.F. to be upset

---

[1] To protect the anonymity of the minor children, we will refer to the parties using their initials.

and confused. The parties had previously agreed they would not tell A.N.F. that Mr. F was not her father until she was at least eighteen years old. Mr. F submitted a proposed parenting plan that would reduce Mrs. F's visitation with the children and require it to be supervised by a neutral third party. He contended that supervision was necessary because Mrs. F's repeated attempts to interfere with his relationship with the children were adversely affecting the children. Mrs. F then filed a motion to continue the hearing on Mr. F's petition. At some point, it appears that the trial court allowed Mr. F to have supervised visitation with A.N.F. pending further orders, and the court allowed him to resume his regular visitation with C.S.F.

On Friday, August 5, 2005, Mr. F returned C.S.F. to Mrs. F for her weekend visitation and told her that C.S.F., then three years old, had fallen and hurt his leg just before they left home. Mrs. F initially treated the injury with an ice pack, but later that evening, she took C.S.F. to the hospital, where doctors discovered that he had a fractured femur. Someone at the hospital notified Child Protective Services ("CPS") because Mrs. F told hospital personnel that C.S.F. had been injured one to three days earlier, while he was in Mr. F's care, and that Mr. F did not seek medical attention for C.S.F.

Mrs. F then filed a motion to modify the parenting plan seeking to be named primary residential parent for both children because of the DCS and CPS investigations of Mr. F. Mrs. F also filed a motion to suspend Mr. F's parenting time with C.S.F. because of the aforementioned incident. Following a hearing on August 22, 2005, the trial court appointed a guardian ad litem, ordered a DCS investigation of the facts surrounding C.S.F.'s leg injury, and ordered that C.S.F. also reside with Mrs. F until the investigations were completed.

Following its investigation regarding the alleged sexual abuse of A.N.F., DCS filed a notice of dismissal of its petition because it found "[n]o factual evidence, no medical proof, nor any counseling records or reports to substantiate the original allegation of inappropriate touching or sexual abuse by the father."

DCS completed its investigation regarding C.S.F.'s leg injury on September 21, 2005. According to the original referral report, Mrs. F had initially reported that C.S.F. was injured and unable to walk for about three days, while in Mr. F's care, without receiving medical attention. According to a medical report, Mrs. F had reported to medical personnel that C.S.F. was injured the day before he was returned to Mrs. F. When questioned by a CPS investigator, Mrs. F did not state that C.S.F. had been injured for days, but simply said she was told by Mr. F that C.S.F. had fallen. In summary, the DCS report stated, "Investigator finds some variation in the mother's story shows no consistency [sic]." After interviewing Mr. F and other witnesses, who explained that C.S.F. was running in the yard and fell, DCS concluded that there was "no evidence at this time to support the allegation of physical abuse," and it recommended that the case be closed.

After the investigations were completed, on October 10, 2005, Mr. F renewed his motion to modify the permanent parenting plan to restrict Mrs. F to supervised visitation. The trial court

subsequently returned custody of A.N.F. to Mr. F without restrictions, but Mrs. F retained custody of C.S.F. pending hearings on the parties' petitions to modify the parenting plan.

On October 22, 2005, Mrs. F's father paid for genetic testing of Mrs. F's former boyfriend, Mr. S, and A.N.F. The test revealed a 99.99% probability that Mr. S is the biological father of A.N.F. On January 9, 2006, Mrs. F and Mr. S filed a joint petition to establish Mr. S's parentage of A.N.F., claiming that the genetic test created a rebuttable presumption that Mr. S was A.N.F.'s father under Tennessee Code Annotated section 36-2-304(a)(5).[2] They sought to have Mr. S listed as the father on A.N.F.'s birth certificate, to have A.N.F.'s last name changed to Mrs. F's maiden name, and to have sole custody of A.N.F. awarded to Mrs. F.

Mr. F filed a response to the petition to establish parentage, contending that he was A.N.F.'s legal father pursuant to the voluntary acknowledgment of paternity and Tennessee Code Annotated section 36-1-102(28). Mr. F also filed a counter-petition to terminate the parental rights of Mr. S on the ground of abandonment.

On February 13, 2006, and May 22, 2006, the trial court held joint hearings to address the original petitions to modify the parenting plan, the petition to establish paternity, and the petition to terminate parental rights.

## A. The Paternity and Parental Termination Proceedings

As previously discussed, Mrs. F and Mr. F executed the voluntary acknowledgment of paternity on or about June 26, 2000, when A.N.F. was eight months old. It was never rescinded or revoked. Mrs. F and Mr. S filed their joint petition to establish paternity of A.N.F. on January 9, 2006, and Mr. F responded with the counter-petition to terminate Mr. S's parental rights based on abandonment.

Mrs. F testified that she and Mr. S broke up in February of 1999 when she was already pregnant with A.N.F. She explained that they were both drinking and had "a really big argument" that included hitting, biting, and Mr. S kicking and damaging her car. According to Mrs. F, Mr. S did not know that she was pregnant at the time of the break-up. Mrs. F subsequently pressed charges against Mr. S. She said she did not call Mr. S after she gave birth to A.N.F., but she testified that she had always known where he was.

Mr. S testified he knew for certain that A.N.F. was his child in November of 2005 after the genetic test was performed, but he "had a feeling" she was his child even before the test. He testified about his knowledge prior to the test as follows:

---

[2] The genetic test was obtained independently, rather than ordered by a court. The parties later stipulated to the accuracy of the genetic test, and its result as to the probability of paternity, but not to the ultimate conclusion that Mr. S is the biological father of A.N.F.

Q. [By Mr. F's attorney] Okay. You also just testified on direct that you had an idea that [A.N.F.] might have been your daughter before the DNA test; is that right?

A. Yes.

Q. What gave you that idea?

A. A friend of mine. . . .

. . . .

Q. Did you ever see or talk to [Mrs. F] after you broke up?

A. We spoke, you know. . . .

. . . .

Q. Did you know she had a child?

A. No, ma'am.

Q. You didn't know she had a child?

A. I had an idea she did, but . . .

Q. When did you get this idea?

A. I guess when [A.N.F.] was a small baby at the time.

Q. Did it ever occur to you that the timetable might add up that you were the father?

A. Yes, ma'am.

Q. It did? Did you ever think to ask [Mrs. F] about it?

A. No, ma'am.

Q. Did you ever think about wanting to assert your parental rights if that was your daughter then?

A. No, ma'am.

. . . .

Q. [By the guardian ad litem] . . . Okay. When did you first – and this may have been asked, but I don't remember the answer to it. When did you first realize that [A.N.F.] could be your child?

A. I would say when she was about three years old,[3] but I didn't know for sure until November.

Q. Until November of this year – of 2005?

A. Yes, sir.

Q. Okay. When did you first learn of the existence of [A.N.F.], that she even existed?

A. When she was [a] small child. I don't recall how old she might have been.

. . . .

Q. A few months old? A baby?

A. Yeah, I seen them around and about in [town] a few times, but I don't know.

---

[3] Mrs. F testified that her sister's friend "blabbed the secret" to Mr. S that A.N.F. was his child. Mr. S testified that this took place when A.N.F. was about three years old.

Q. Okay. Well, if you saw her as a baby – you remember having sex [with Mrs. F], right?
A. Yes, sir.
Q. Why didn't it dawn on you at that point in time that, hey, this might be my child. Did it ever?
A. Yes, sir.
Q. It did, but you just didn't do anything to come in and take responsibility for your child until she was three [sic] years old.
A. No, sir.
Q. You didn't –
A. I didn't want to try to interfere in nobody's marriage or nothing like that.
. . . .

Q. [By Mr. S's attorney] Did you ever believe that [A.N.F.] could have been his child? Mr. [F]'s?
A. No, ma'am.
. . . .
Q. Did you ever suspect that Mr. [F] could be the biological father?
A. No , ma'am.

Mr. S never financially supported or bonded with A.N.F. during the first six years of her life. He testified that in the past three months since the DNA test, he had visited A.N.F. on most of the Sundays when A.N.F. had visitation with Mrs. F, which was apparently every other weekend. Mr. S testified that he had given Mrs. F about $100 in cash to support A.N.F. in each of those three months, and he bought A.N.F. a winter coat once, before he "knew for sure" that she was his child. Mr. F testified that Mr. S had never contacted him in an attempt to visit or support A.N.F., and Mrs. F's father[4] testified that he had never seen Mr. S with A.N.F. There was conflicting testimony about how Mrs. F and Mr. S reconnected during the custody litigation, but Mr. S testified that Mrs. F wanted him to get involved in the case "to give her legal rights to custody." Mr. S did not return for the second day of trial. Mrs. F testified that he was working.

The trial court entered a lengthy final order addressing the paternity petition and the counter-petition to terminate the parental rights of Mr. S, with the following particularly relevant findings:

> The Court finds that the testimony of [Mrs. F] and [Mr. S] in open court, as it relates to this matter, was not credible.
> The Court further finds that the Voluntary Acknowledgment of Paternity executed by [Mr. F] and [Mrs. F] on June 26, 2000 is valid and has not been rescinded pursuant to the laws of the State of Tennessee. As such, the Court finds

---

[4] Mrs. F lived with her parents at the time of the divorce, but she subsequently moved into a separate trailer owned by her father, located next to her parents' house. Mrs. F's father testified that he has a very close relationship with Mrs. F and her children, and he and his wife testified at length regarding the children and Mrs. F's circumstances.

that neither [Mr. S] nor [Mrs. F] has legal standing in this Court to challenge the paternity rights of [Mr. F].

. . . .

The Court further finds that [Mr. S] had knowledge of his paternity of the child as soon [as] the child was three (3) years of age and that [Mr. S] did not attempt to support the child or her mother and did not attempt to establish a relationship with said child. The Court thus finds that [Mr. S] had reason to know that [A.N.F.] was his biological daughter and willfully failed to honor his obligations until [Mrs. F] contacted him in an effort to bolster her chances in a custody proceeding involving said child . . . .

This Court has determined by clear and convincing evidence that [Mr. S] has abandoned the minor child, [A.N.F.], as defined in Tennessee Code Annotated § 36-1-102. Specifically, [Mr. S] has willfully failed to visit and has willfully failed to support or make reasonable payment toward the minor child for a period exceeding four (4) consecutive months immediately preceding the filing of the Petition for Termination of Parental Rights. Further, [Mr. S] willfully failed to visit and willfully failed to make reasonable payments toward the support of the child's mother during the four (4) months immediately preceding the birth of the child whose birth occurred more than thirty (30) days ago.

The Court finds that termination of [Mr. S]'s parental rights to this child is in the best interest of the child.

This Court finds, by a preponderance of the evidence, that [Mr. F] is the legal father of [A.N.F.], acknowledging said child pursuant to Tennessee state law and holding said child out as his own, and the Court finds that [Mr. F] should be and hereby is given full parentage rights with respect to said child.

. . . .

T.C.A. § 24-7-113(e)(2) provides that if a Voluntary Acknowledgment of Paternity has not been rescinded by the signatory to the acknowledgment in accordance with the statute, then it may only be challenged on the basis of fraud, duress or material mistake of fact. Such challenge must also be instituted within five (5) years of the execution of the acknowledgment or it is barred by a five (5) year statute of limitations.[5]

. . . .

The Court further finds that neither [Mrs. F] nor her Co-Plaintiff, [Mr. S], has standing to challenge this Voluntary Acknowledgment of Paternity because such challenge is barred by the applicable statute of limitations.

. . . .

. . . The Court, based on the testimony of [Mr. S], believes that [Mr. S] and [Mrs. F] colluded to bring this action for parentage in an attempt to give [Mrs. F]

---

[5] The court recognized in a footnote that there is a limited statutory exception authorizing a challenge after five years "if fraud against the birth mother is alleged and the interests of the child are not affected," but the court concluded, "[t]his is not the case here."

leverage in pursuing a Motion to Modify Parenting Plan, whereby she requested that she be named custodial parent of her children, which was pending . . . at the time the genetic test was administered.

The order was made final pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure, and Mrs. F and Mr. S jointly filed a notice of appeal.[6]

## B.    The Petition to Modify the Permanent Parenting Plan

As stated above, three months after the final decree of divorce, Mr. F filed his petition to modify the permanent parenting plan after Mrs. F reported to DCS that he had sexually abused A.N.F.  He renewed his motion after he was investigated by CPS regarding C.S.F.'s leg injury.  Mr. F sought an order reducing Mrs. F's visitation and requiring her visitation to be supervised by a neutral third party.  Mrs. F also filed a petition to modify the parenting plan, seeking to be named primary residential parent of both children.  Both parties contended that the circumstances surrounding the DCS investigations constituted a material change in circumstances to justify modifying the parenting plan.

Numerous witnesses testified regarding the allegations that Mr. F sexually abused A.N.F.  Mrs. F and both of her parents testified that A.N.F. told them she was touched in her private area by Mr. F.  According to one DCS report, A.N.F. initially stated to a DCS investigator that Mr. F touched her outside of her clothing, by accident; however, she later "recanted" her story.  As mentioned earlier, either DCS or the court required that A.N.F. receive counseling following the allegations of abuse, but her counselor did not testify.  Mrs. F subsequently took A.N.F. to a licensed clinical social worker, Julia Austin, who also counseled Mrs. F, in an attempt to deal with some aggressive behavior A.N.F. was beginning to display.  Mrs. F told Ms. Austin about the allegations of sexual abuse during their first session.  Ms. Austin testified that A.N.F. told her during one session that Mr. F touched her private area, but outside her panties.  A.N.F. said this had only happened one time.  Ms. Austin could not recall whether she asked A.N.F. if anyone told her to say that she was inappropriately touched, but Ms. Austin said she did not detect any signs of coaching and she believed A.N.F.  Ms. Austin did acknowledge, though, that A.N.F. made some other statements to her that were not true.  When asked whether she observed any symptoms of sexual abuse, Ms. Austin replied, "Barely, but most of them were the acting out, going to be in control, defiant, oppositional, angry."

The guardian ad litem's secretary testified about an encounter she had with A.N.F.  While Mr. F was meeting with the guardian ad litem at his office, the secretary was playing with A.N.F. with some toys in a separate office.  A.N.F. was identifying various toy animals and suddenly blurted out that Mr. F had touched her private area.  The secretary testified that she was somewhat stunned by the remark, then she asked A.N.F., "Why did you say that?"  A.N.F. replied, "[Mrs. F.] told me to."

---

[6] Although some of the documents filed in this Court list Mrs. F as the only appellant in the paternity and parental termination case, Mrs. F's attorney insists that she also represents Mr. S on appeal.

A.N.F. was examined for signs of sexual abuse at a local emergency room, and none was found. DCS reported that it found "[n]o factual evidence, no medical proof, nor any counseling records or reports to substantiate the original allegation of inappropriate touching or sexual abuse by the father."

Mrs. F's father testified that Mrs. F had falsely accused him of sexual abuse in the past. Mrs. F admitted that approximately six to ten years earlier, she did falsely accuse her father of sexually molesting her. Mrs. F also admitted that she had erroneously accused Mr. F of sexually abusing A.N.F. on a previous occasion, only explaining that she "thought he had done something wrong and he didn't." She had acknowledged during the divorce trial that she had "a tendency to lie especially about men in [her] life." Mr. F testified that he would never molest A.N.F., and he accused Mrs. F of making up the story. Mr. F said, "that was just her way of getting the kids away from me."

The court also heard extensive testimony regarding C.S.F.'s leg injury. Mrs. F testified that C.S.F. told her he was running in the yard after he pulled a little girl's hair, and he fell and hurt his leg. Mr. F and his father testified they were sitting outside on a Friday afternoon before Mr. F had to meet Mrs. F with the children, and they saw C.S.F. fall when he was running across the yard with the other child. Mrs. F testified that the hospital personnel contacted CPS because they were required to do so by law when a child suffered a break in a large bone. Dr. Raymond Stefko, the pediatric orthopedist who treated C.S.F., testified to the contrary. Dr. Stefko testified by deposition that he sees this type of fracture in young children on a regular basis, and it is not the type of fracture that is typically seen in someone who has been struck by a direct blow. Rather, it would require a twisting-type motion, such as if someone was running and caught his or her foot in a hole. Dr. Stefko testified that the type of injury itself did not suggest anything other than an accident. He explained, "the thing that was concerning to me was the circumstances around the injury and the fact that, at least from what I was told by the mother who brought the child in, there was allegedly a significant delay from when the fracture occurred to when the child was presented for medical care." Therefore, he instructed a nurse to contact CPS. A document in C.S.F.'s medical records reads, "The father told the mother that the child tripped while running *the day before* and did not seek medical care for the child." (emphasis added). The DCS report indicates that Mrs. F reported C.S.F. had been unable to walk for three days while in Mr. F's care, without medical attention. A bank employee testified that she specifically recalled seeing C.S.F. at the bank with Mr. F on Friday afternoon, and C.S.F. was uninjured and walking normally.

Mr. F testified that he did not realize the severity of C.S.F.'s injury, and he would have taken the child to the hospital had he suspected that his leg was broken. Mr. F said that C.S.F. stopped crying for a while, his leg was not swollen, and there were no visible signs that his leg was broken. Dr. Stefko explained that as an orthopedic surgeon, he knew simply by observing C.S.F.'s leg that it was broken; however, he said a layperson might not know the leg was broken. Dr. Stefko recalled some swelling when C.S.F. arrived at the hospital, but no signs of bruising and no fever. Mrs. F testified that she initially took C.S.F. home and put an ice pack on his knee. Mrs. F's father witnessed C.S.F. crying, and he testified that he thought C.S.F. would "be all right in a little bit."

He testified that C.S.F. was somewhat consolable, and he did not immediately think that C.S.F.'s leg could be broken.

Mrs. F and her parents also testified that the children had suffered other injuries since the final decree of divorce while in Mr. F's care. They testified that C.S.F. once had a black eye when he returned from Mr. F's house. They testified that A.N.F. once had her arm in a sling after she fell off the doorsteps at Mr. F's parents' house. They also said A.N.F. needed stitches above her eye after she was bouncing on a bed at Mr. F's house and fell off. Mr. F acknowledged A.N.F.'s two injuries requiring the stitches and the sling, but he and his father both denied ever seeing C.S.F. with a black eye. Mr. F said his children had never been purposefully injured. He testified that although he supervises the children, they play and sometimes get hurt. Mrs. F acknowledged that the children would occasionally get hurt during the parties' marriage by falling off beds or falling on stairs, like "normal kids." Mrs. F testified that since the divorce, C.S.F. had also been injured while in her care by jumping off the doorsteps, and he had to be taken to the emergency room.

Mrs. F and her parents testified that since the divorce, they observed bruising on A.N.F.'s bottom that could have been belt marks. Mrs. F's father testified that there were three long bruises appearing across A.N.F.'s backside, but Mrs. F's mother testified that there was only one bruise, approximately one inch wide and one inch long. Mr. F testified that he had not seen the bruises on A.N.F.'s behind. He testified that A.N.F. was not bruised or even spanked while in his custody when the bruising allegedly occurred. Mr. F said he had previously, "on occasion," used a belt to spank the children, but he had not spanked them with a belt since the parties' divorce.

Mrs. F also contended that a material change in circumstances had occurred because the children often cry, throw fits, and tell her they do not want to go to Mr. F's house. She introduced a videotape of some visitation exchanges in support of her allegations. Mrs. F's father testified that he had videotaped "basically every one" of their visitation exchanges, and he said the children were not always upset. Mr. F accused Mrs. F of coaching the children to cry at exchanges, explaining that she would carry them and stop directly in front of the video camera in order to record them crying, and he claimed that the children would stop crying as soon as they got into his car. Mr. F testified that the children no longer cry at exchanges, and Mrs. F acknowledged that A.N.F. had been throwing fits "up until recently." Mrs. F's father similarly testified that A.N.F. was "not as bad" at exchanges in the past few months, and that C.S.F. is "always proud" to see Mr. F and likes to go with him. Two of Mr. F's neighbors testified that they have dinner with Mr. F and his children weekly, and that they have a normal, loving relationship.

Mrs. F also claimed that her circumstances had changed because, at the time of the divorce, she was unemployed for medical reasons and living with her parents, whereas, at the time of trial, she was employed, had a car, and lived in a separate trailer next to her parents' house. By the conclusion of the trial, however, Mrs. F was again unemployed. She testified she was drawing unemployment, working as a cook one day per week, and "waiting on an answer to see if they'll cover my college I want to go to." Mrs. F testified that she suffers from mild to moderate depression "due to a heart disease," but she said her depression was under control through medication.

Mr. F's circumstances had also changed somewhat. Mr. F was briefly married to another woman, but he was in the process of a divorce at the time of trial. He testified that Mrs. F accused his new wife of pushing C.S.F. and causing him to break his leg, and that the "issues" regarding his custody dispute with Mrs. F led to his separation from his current wife. Mr. F had quit his previous job shortly after the divorce to become self-employed in a boat repair business. Mr. F testified that this arrangement allowed him to have flexible hours so that he could supervise the children. Mrs. F accused Mr. F of failing to provide insurance for the children as required by the parenting plan because his insurance through his former employer was cancelled when he quit. Mr. F testified that A.N.F. had been covered under TennCare, but it was cancelled because Mrs. F was drawing food stamps on both children when she did not have custody of them. He testified that he was trying to make arrangements to provide them with coverage.

Mr. F claimed a material change in circumstances had occurred because of Mrs. F's constant interference with his relationship with the children. He testified that he and Mrs. F were not able to get along since the divorce. It appears that the police were called to two of their visitation exchanges. Mr. F also described what he considered to be harassing notes from Mrs. F referring to A.N.F.'s "real dad." He introduced another note instructing him not to bathe the children together, when they were ages two and four, or else she would "take this matter to the judge." Mr. F also testified that he did not like the fact that Mrs. F returned his son from visitation with his toenails painted pink. Both parties testified that the other parent would not answer his or her telephone calls when the children were at the other parent's house.

Mr. F testified that he wanted the children to continue having a relationship with Mrs. F, but in his opinion, the children's best interest was not being served by involving them in baseless allegations, investigations, lies, and disputes. He said he considered Mrs. F to be a fit parent except for "everything she's tried to do since the custody was handed down to get custody away from me."

Mrs. F submitted a proposed parenting plan that allowed Mr. F to have visitation with both children, every other weekend. At trial, however, Mrs. F testified that Mr. F should be restricted to supervised visitation with A.N.F.

The trial court ultimately found that no material change in circumstances had occurred to justify changing primary custody to Mrs. F. However, the court concluded that a material change in circumstances did exist to warrant restricting Mrs. F's visitation. The trial court's factual findings are lengthy, but the following are noteworthy:

> As reflected throughout the transcript of the parties' divorce proceedings, filed as an Exhibit in this cause, the trial court cannot deny that the separation and divorce of these parties has been contentious and that [Mrs. F] has used the children as pawns to hurt [Mr. F] by repeatedly reporting him to DCS. Specifically, with respect to the allegations of inappropriate sexual touching, DCS completed a full, complete and thorough investigation of any and all allegations, and the [court] appointed a

-11-

Guardian Ad Litem to investigate the matter for the Court. At the end of the DCS investigation, . . . DCS found no factual evidence, no medical proof, nor any counseling records or reports to substantiate any claims made by [Mrs. F]. . . .

[Mrs. F] offered no new factual evidence, no medical proof and no counseling records or reports at trial. In fact, [Mrs. F]'s only proof concerning the DCS investigation and allegations of inappropriate touching were the testimony of [Mrs. F], her parents and Julia Austin, a licensed clinical social worker who did not counsel the child to determine whether or not she had been sexually abused.

As noted in the trial transcript from the parties' divorce and again at this trial, [Mrs. F] admittedly lies about the men in her life, even going so far as to accuse her own father of sexually molesting her because she was angry with him. . . . Mother admitted in testimony that she had, on one previous occasion, reported [Mr. F] to DCS for sexual abuse that was unfounded. The Court finds that [Mrs. F]'s testimony concerning any allegations of inappropriate sexual touching is not credible.

. . . The Court finds that [Mrs. F]'s parents' testimony is not credible due to the fact that [Mrs. F]'s father attempted to coach the testimony of [Mrs. F]'s mother at the initial trial of divorce.[7]

. . . .

Also, the Court finds that [Mrs. F]'s behavior toward [Mr. F] since [the date of the divorce decree] is in keeping with untrue statements. Since this date, [Mrs. F] has threatened to take [Mr. F] back to Court in an effort to destroy his custody rights for no reason other than selfishness. . . .

The Court finds that [Mrs. F] offered no evidence, much less a preponderance, to substantiate any allegations of inappropriate sexual touching. Therefore, the fact that [Mr. F] was investigated by DCS for frivolous claims made by [Mrs. F], which were later dismissed, does not constitute a material change in circumstances that would warrant a change in custody.

Second, [Mrs. F] alleged that since [the divorce decree], the parties' minor son, [C.S.F.] had been injured while in the care of [Mr. F] and [Mr. F] neglected to obtain proper medical care for the child.

. . . .

Based on the testimony of the parties and witnesses, the medical records, the report submitted by DCS and the deposition of Dr. Stefko, the Court finds . . . no evidence, much less a preponderance, to substantiate any allegations of medical neglect or any type of neglect concerning this issue. . . .

. . . .

[Mrs. F] has failed to establish a material change in circumstance, by any individual allegation or by the collective allegations, since [the date of divorce], and as such, the petition to modify custody must be denied.

---

[7] Mrs. F's father was questioned about being excused from the courtroom during the previous divorce trial because the judge concluded he was coaching his wife's testimony. Mrs. F's father stated that he was not attempting to coach his wife, and that he has a "nervous neck," which causes him to nod and bob his head.

On the other hand, with respect to [Mr. F]'s Motion to Modify Permanent Parenting Plan and as alleged therein, the Court finds that Mother's collective bad behavior since [the date of divorce] constitutes a material change in circumstances that would warrant limiting [Mrs. F]'s visitation time with the minor children.

First, the Court finds that Mother's allegations concerning false sexual misconduct on the part of [Mr. F] toward the parties' daughter constitutes a material change in the children's circumstances. Specifically, . . . Mother has, at least twice, reported [Mr. F] to DCS for misconduct that turned out to be absolutely false and unsupported by the child's own statements or any other evidence. Mother even went so far as to subject her five year old child to an examination for evidence of sexual abuse knowing no such abuse had occurred. The Court finds such conduct was not only unnecessary and cruel but endangered the physical and emotional well-being of the minor child and shows a reckless disregard for the welfare of the child. Additionally, . . . Mother has a history of making false allegations of sexual abuse against people with whom she is angry. . . .

. . . [Regarding C.S.F.'s leg injury,] [b]ased on the testimony of the parties and witnesses, the medical records, the report submitted by DCS and the deposition of Dr. Stefko, the Court finds that [Mrs. F] knowingly lied to doctors, nurses and other personnel at two (2) hospitals and to DCS in an effort to prevent [Mr. F] from exercising his full custody rights with the children. . . .

The Court also finds that [Mrs. F] has repeatedly reported [Mr. F] to DCS for known false conduct on [Mr. F]'s part in an effort to torment [Mr. F] and use the children as pawns in the parties' ongoing conflict. The Court further finds that [Mrs. F] has been less than truthful with DCS and finds that [Mrs. F]'s conduct is not only an abuse of the legal system, but such conduct is outrageous to the extent that [Mrs. F] knowingly depletes funds from DCS that could be spent protecting actual abused children.

. . . .

. . . [Mrs. F], by her own testimony and the testimony of [Mr. S], introduced the parties' older daughter, [A.N.F.], to [Mr. S], a man alleged to be her biological father, shattering the child's understanding of her relationship with [Mr. F] and introducing her to a man she never knew. . . . [Mrs. F] did not discuss such introduction with [Mr. F], who testified that he did not want to reveal this information to [A.N.F.] at this point in time. The Court finds it interesting that [Mr. S] testified on behalf of [Mrs. F] at the initial day of trial, . . . but apparently did not feel compelled to return for the second day of trial. The Court finds that [Mrs. F]'s actions were intended solely to hurt [Mr. F] and further her chances of gaining custody of the children at trial. . . . The Court finds that [Mrs. F] will stop at nothing to ensure that the children are not allowed to have a healthy, peaceful, loving relationship with their father, and that such behavior is not in the best interest of the children and represents a material change in circumstance such that the present custody order of this court should be modified to restrict the visitation and/or custody rights of [Mrs. F].

-13-

. . . .

The Court finds that restricting [Mrs. F]'s visitation such that it is supervised is in the best interest of the children.

. . . .

. . . As noted by [Mr. F] in trial, the parties' older daughter, [A.N.F.], struggled in school. Due to [Mr. F]'s work tutoring the child, she is expected to move into first grade in the fall of 2006, a fact that was formerly in question.

. . . [T]he Court finds that the care of the minor children has been disrupted throughout the proceedings between the parties following the breakdown of their marriage. . . . [A.N.F.] is now settled with [Mr. F] and progressing well at [the local] Elementary School. It would be to the benefit of both children to live together full time with [Mr. F].

. . . .

. . . [T]he Court finds, by a preponderance of the evidence, that it is in the best interest of both [A.N.F.] and [C.S.F.] that [Mr. F]'s proposed Permanent Parenting Plan be adopted and approved by the Court such that [Mrs. F]'s visitation is restricted to supervised visits on alternate weekends. . . .

Mrs. F timely filed a notice of appeal.[8]


## II. ISSUES PRESENTED

On appeal, Mrs. F and Mr. S present the following issues, slightly restated, for review:

1. Whether the trial court erred in allowing Mr. F's witnesses to testify.
2. Whether the trial court erred in denying the petition to establish Mr. S's paternity and terminating his parental rights.
3. Whether the trial court erred in failing to find a material change in circumstances to justify changing custody to Mrs. F.
4. Whether the trial court erred in finding a material change in circumstances to justify restricting Mrs. F's visitation.

---

[8] After Mrs. F filed her notice of appeal to this Court, she filed, in the trial court, a motion to alter or amend and/or for Rule 60 relief, along with a motion requesting that the trial court dismiss her notice of appeal to this Court and transfer the case to chancery court. The trial court entered an order purportedly dismissing her notice of appeal and transferring the case to chancery court, and the chancery court then denied Mrs. F's motion to alter or amend and/or for Rule 60 relief. Mrs. F then filed a second notice of appeal to this Court.

These subsequent proceedings do not affect the issues presented for review, but we would remind counsel that a trial court has no jurisdiction to consider a Rule 60.02 motion or Rule 59.04 motion after a notice of appeal has been filed. *Spence v. Allstate Ins. Co.*, 883 S.W.2d 586, 595-96 (Tenn. 1994); *Spann v. Abraham*, 36 S.W.3d 452, 460 (Tenn. Ct. App. 1999). The appellate court's jurisdiction attaches upon the filing of the notice of appeal. *Granderson v. Hicks*, No. 02A01-9801-JV-00007, 1998 WL 886559, at *1 (Tenn. Ct. App. W.S. Dec. 17, 1998). If a party wishes to seek relief from a judgment after that time, he has the option of applying to the appellate court for an order of remand. *Spence*, 883 S.W.2d at 596.

5.     Whether the trial court erred in denying Mrs. F's request for attorney's fees.

For the following reasons, we affirm the trial court's judgment but modify the parenting plan as provided hereinafter.[9]

### III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2007); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *Machinery Sales Co., Inc. v. Diamondcut Forestry Prods., LLC*, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002). The weight, faith, and credit to be given to a witness's testimony lies, in the first instance, with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id.* We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

### IV. DISCUSSION

#### A.     Sequestration of Witnesses

First, we will address Mrs. F's contention that the trial judge erred in allowing certain witnesses to testify. At the beginning of each hearing, Mrs. F's attorney called for "the Rule." Tennessee Rule of Evidence 615, familiarly known as "the Rule," provides, in relevant part:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. . . . The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness.

---

[9] Within the section of Mrs. F's brief addressing the issue of whether a material change in circumstances occurred, she asserts that "the ruling as to the parties' income was contrary to the evidence." She does not suggest a proper figure as to the parties' incomes, she does not present an issue for review regarding child support, and she does not cite any authority in support of this argument. Therefore, we consider it waived. *See Newcomb v. Kohler Co.*, 222 S.W.3d 368, 400 (Tenn. Ct. App. 2006) ("It is not the function of the appellate court to research and construct the parties' arguments."); *Childress v. Union Realty Co., Ltd.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002) ("We consider an issue waived where it is argued in the brief but not designated as an issue.")

"The purpose of the rule, simply put, is to prevent a witness from changing or altering his or her testimony based on testimony heard or facts learned from other testifying witnesses." ***State v. Bane***, 57 S.W.3d 411, 423 (Tenn. 2001). During the second day of trial, Mrs. F's attorney stated that she objected to the court hearing testimony from any more of Mr. F's witnesses, who were sitting in the hallway outside the courtroom, because Mr. F's father's girlfriend allegedly left the courtroom several times and spoke with the people in the hallway. The trial judge stated that he would allow Mrs. F's attorney to voir dire each of the witnesses prior to his or her testimony in order to determine whether a violation of the Rule had occurred.

Before Mr. F's father testified, counsel for Mrs. F asked about his communication with his girlfriend outside the courtroom. Mr. F's father stated that when his girlfriend left the courtroom to smoke, he asked her who was on the witness stand, and she told him that his son was on the stand. He testified that she did not tell him anything else about what was "going on," and said, "She can't hear what's going on anyway. She's hard of hearing." The trial judge then overruled the objection with respect to Mr. F's father and allowed him to testify.

Mr. F's friend and neighbor was similarly questioned before he testified. The friend stated that on one occasion when the woman in question came outside the courtroom, she told him that "mother" was on the stand, and she told him about the court taking a break. He said she did not discuss the case at all. The trial judge overruled Mrs. F's attorney's objection and allowed the witness to testify.

Finally, the aforementioned friend's mother, also a neighbor, was questioned before she testified. This witness stated, "She only came out to smoke and if she said anything, it wasn't anything about anything in here. . . . Other than she might have told who was on the witness stand, but other than that, she didn't say anything about what was being said." The judge again overruled counsel's objection and allowed the witness to testify.

A trial court has "broad discretion" in determining whether to exclude a witness suspected of violating Tennessee Rule of Evidence 615. ***Long v. Miller***, No. E2006-02237-COA-R3-CV, 2007 WL 2751663, at *9 (Tenn. Ct. App. Sept. 21, 2007) (quoting *Johnson v. Johnson*, No. M2000-00358-COA-R3-CV, 2001 WL 980737, at *9 (Tenn. Ct. App. Aug. 28, 2001)). "When a sequestration rule violation is raised on appeal, we consider the seriousness of the violation and the prejudice, if any, suffered by the objecting party." ***State v. Lilly***, No. W2003-02156-COA-R3-PT, 2004 WL 948397, at *5 (Tenn. Ct. App. Apr. 30, 2004). On appeal, Mrs. F does not specify how she was prejudiced by the overruling of her objection. The trial judge obviously believed the witnesses' accounts of what transpired outside the courtroom and that they were not informed about "any live trial testimony or exhibits created in the courtroom by a witness." *See* Tenn. R. Evid. 615. We find no abuse of discretion in the trial court's decision to overrule Mrs. F's objection.

### B.    *The Petition to Establish Paternity & Counter-Petition to Terminate Parental Rights*
To review, Mrs. F and Mr. F executed the voluntary acknowledgment of paternity on or about June 27, 2000. Mrs. F and Mr. S attempted to establish Mr. S's parentage on January 9, 2006.

Tennessee Code Annotated section 24-7-113 addresses the effect of a voluntary acknowledgment of paternity. In reviewing the statute, we bear in mind that the "most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Overstreet v. TRW Commercial Steering Div.*, 256 S.W.3d 626, 630 (Tenn. 2008) (quoting *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002)). "In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing." *Id.* (citing *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005)). If the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use. *Id.* (citing *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004)).

Tennessee Code Annotated section 24-7-113 provides, in relevant part:

(a) A voluntary acknowledgment of paternity which is completed under the provisions of § 68-3-203(g), § 68-3-302, or § 68-3-305(b)[10] or under similar provisions of another state or government shall constitute a legal finding of paternity on the individual named as the father of the child in the acknowledgment, subject to rescission as provided in subsection (c). The acknowledgment, unless rescinded pursuant to subsection (c), shall be conclusive of that father's paternity without further order of the court.

(b)(1) A voluntary acknowledgment of paternity which is completed under the provisions of § 68-3-203(g), § 68-3-302, or § 68-3-305(b), or under similar provisions of another state or government, when certified by the state registrar or other governmental entity maintaining the record of the acknowledgment, or the copy of the voluntary acknowledgment completed pursuant to § 68-3-302(e), shall be a basis for establishing a support order without requiring any further proceedings to establish paternity.

(2) An acknowledgment of paternity executed as described in subdivision (b)(1) shall be entitled to full faith and credit in any judicial or administrative proceeding in this state.

(3) No judicial or administrative proceedings are required, nor shall any such proceedings be permitted, to ratify an unchallenged acknowledgment of paternity in order to create the conclusive status of the acknowledgment of paternity.
. . .

A voluntary acknowledgment of paternity establishes a "legal relationship" between the named father and the child, *In re Adoption of W.J.P.*, No. E2007-01043-COA-R3-PT, 2008 WL 246015, at *7

---

[10] There is no contention in this case that the voluntary acknowledgment of paternity does not comply with the applicable statutes.

(Tenn. Ct. App. Jan. 30, 2008); ***In re Adoption of A.M.H.***, No. W2004-01225-COA-R3-PT, 2005 WL 3132353, at *78 (Tenn. Ct. App. Nov. 23, 2005) *rev'd on other grounds*, 215 S.W.3d 793 (Tenn. 2007), and serves as a mechanism by which unmarried fathers may "legally establish their paternity without the intervention of the court." ***State ex rel. Robinson v. Glenn***, No. W2006-00557-COA-R3-JV, 2007 WL 1227377, at *2 (Tenn. Ct. App. Apr. 26, 2007); ***State ex rel. Parks v. Parks***, No. W2005-00957-COA-R3-JV, 2006 WL 2032560, at *6 (Tenn. Ct. App. Jan. 19, 2006). "A man . . . who has signed, pursuant to §§ 24-7-113, 68-3-203(g), 68-3-302 or 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under the provisions of Tennessee law" is considered a "legal parent." Tenn. Code Ann. § 36-1-102(28)(D) (2005).

Tennessee Code Annotated section 24-7-113 also sets out the manner in which a party must challenge a voluntary acknowledgment of paternity and includes a statute of limitations providing time limits in which a voluntary acknowledgment of paternity can be challenged. ***Robinson***, 2007 WL 1227377, at *4; ***Parks***, 2006 WL 2032560, at *8. Section (c) of the statute permits a signatory to the acknowledgment to rescind it within sixty days of its execution upon the filing of certain sworn documents. ***Parks***, 2006 WL 2032560, at *6 (citing Tenn. Code Ann. § 24-7-113(c) (2000)). Alternatively, the voluntary acknowledgment may be challenged on the basis of "fraud, whether extrinsic or intrinsic, duress, or material mistake of fact" within five years of the execution of the acknowledgment. *Id.* (citing Tenn. Code Ann. § 24-7-113(e) (2000)). Clearly, the time period for such challenges in this case has passed. However, the statute also provides that a challenge to a voluntary acknowledgment of paternity "shall not be barred by the five (5) year statute of limitations where fraud in the procurement of the acknowledgment by the mother of the child is alleged and where the requested relief will not affect the interests of the child, the state, or any Title IV-D agency." Tenn. Code Ann. § 24-7-113(e)(2) (2000). If the court finds that the challenger meets all of these elements, "then, and only then, the court shall order parentage tests." Tenn. Code Ann. § 24-7-113(e)(2) (2000).

The trial court recognized in its written findings and conclusions that a party may challenge a voluntary acknowledgment of paternity after five years "if fraud against the birth mother is alleged and the interests of the child are not affected," but it concluded, "[t]his is not the case here." We agree with the trial court's conclusion. Mrs. F and Mr. S did not allege fraud of any sort,[11] much less "fraud in the procurement of the acknowledgment by the mother." The burden of proving such fraud was upon Mrs. F and Mr. S as the challengers. ***State Dep't of Human Servs. ex rel. Ellis v. Humes***, No. W2004-00602-COA-R3-JV, 2005 WL 562753, at *3 (Tenn. Ct. App. Mar. 10, 2005); *see also* Tenn. Code Ann. § 24-7-113(e)(4) (2000) ("The burden of proof in any such proceeding shall be upon the challenger."). In order to challenge the voluntary acknowledgment of paternity based on fraud, they were required to demonstrate:

---

[11] Although Mrs. F testified that no one provided her with an explanation of the voluntary acknowledgment when she signed it, she does not contend that she did not understand the effect of the document or that any type of fraud was involved. We note that Mrs. F signed the document immediately below the following sentences: "I further acknowledge that I have been orally advised of my rights and responsibilities as set forth in Section IV above in signing an acknowledgment of paternity. I certify that I understand all of the information on this form and that I sign this acknowledgment of paternity freely and voluntarily."

-18-

(1) an intentional misrepresentation with regard to a material fact; (2) knowledge of the representation['s] falsity – that the representation was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity; (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage; and (4) that the misrepresentation relates to an existing or past fact, or, if the claim is based on promissory fraud, then the misrepresentation must "embody a promise of future action without the present intention to carry out the promise."

*Jones v. State ex rel. Coleman*, No. W2006-00540-COA-R3-JV, 2006 WL 3613612, at *3 (Tenn. Ct. App. Dec. 12, 2006); *Ellis*, 2005 WL 562753, at *3. Mr. S certainly did not rely on any misrepresentation, or even the voluntary acknowledgment of paternity, to his detriment. At trial, he testified as follows:

> Q. Did you ever believe that [A.N.F.] could have been his child? Mr. [F]'s?
> A. No, ma'am.
> . . . .
> Q. Did you ever suspect that Mr. [F] could be the biological father?
> A. No , ma'am.

In addition, even if Mrs. F and Mr. S had properly established fraud, "a party seeking relief under T.C.A. § 24-7-113 outside the five year statute of limitations must also show that the requested relief will not affect the interests of the child, the state, or any Title IV-D agency." *Jones*, 2006 WL 3613612, at *4; *see* Tenn. Code Ann. § 24-7-113(e)(2) (2000). We conclude that Mrs. F and Mr. S failed to meet this burden as well. By including this second requirement in the statute, the legislature clearly recognized that when a voluntary acknowledgment of paternity has gone unchallenged for over five years, it may not be in the child's best interest to set aside that acknowledgment, even if the named father is not the biological father.[12] Mrs. F and Mr. S allowed A.N.F. to grow up believing that Mr. F was her father. We cannot say that it "will not affect the interests of the child" to set aside Mr. F's voluntary acknowledgment of paternity now. We have previously recognized that "[t]he interest in determining true parentage must, of course, be weighed

---

[12] Michigan's acknowledgment statute similarly provides that a party seeking revocation of a voluntary acknowledgment of paternity under some theories must prove that "considering the equities of the case, revocation of the acknowledgment is proper." Mich. Comp. Laws § 722.1011(3). In applying that section in a case similar to this one, the Michigan Court of Appeals recently explained:

> It may well be that the Legislature, which has always been concerned chiefly with the best interests and protection of children as reflected in various legislation, made a policy decision in enacting MCL 722.1011(3), which recognized that, regardless of the lack of biological ties, a child's well-being might be better served by having a male acknowledger continue caring for the child as father, especially if he has done so for many years, rather than traumatically removing the man from the child's life and introducing a new male who is essentially a stranger.

*Sinicropi v. Mazurek*, 273 Mich. App. 149, 161, 729 N.W.2d 256, 264, n.4 (2006). We find this reasoning persuasive.

against the need for stability for the child. ***Granderson v. Hicks***, No. 02A01-9801-JV-00007, 1998 WL 886559, at *3 (Tenn. Ct. App. W.S. Dec. 17, 1998). "[P]arentage testing should be denied when the equitable considerations do not support the disestablishment of paternity." ***Ellis***, 2005 WL 562753, at *3 (citing *State ex rel. Russell v. West*, 115 S.W.3d 886 (Tenn. Ct. App. 2003)).

Because Mrs. F and Mr. S challenged the voluntary acknowledgment of paternity more than five years after its execution, they did not rely on a fraud theory, and they did not demonstrate that the requested relief would not affect the interests of A.N.F., their challenge is barred by the applicable statute of limitations set forth in Tennessee Code Annotated section 24-7-113(e)(2).

On appeal, Mrs. F and Mr. S do not address the voluntary acknowledgment of paternity statutes at all. Instead, they contend that our Supreme Court's recent decision in ***In re T.K.Y.***, 205 S.W.3d 343 (Tenn. 2006), controls the outcome of this case. We respectfully disagree. ***In re T.K.Y.*** involved a child born as the result of an extra-marital affair, and the dispute was between the mother's husband and her paramour, who had been adjudicated the child's biological father. ***Id.*** at 346. Both men were rebuttably presumed to be the child's father pursuant to Tennessee Code Annotated section 36-2-304, and the Court was faced with analyzing Tennessee Code Annotated sections 36-2-301 to -322 to determine parentage. ***Id.*** at 349. However, that Part of Tennessee Code Annotated "provides a single cause of action to establish parentage of children *other than establishment . . . by acknowledgment of parentage* pursuant to §§ 68-3-203(g), 68-3-302 or 68-3-305(b)." Tenn. Code Ann. § 36-2-301 (2005) (emphasis added). "Absent an agreement or an acknowledgment of parentage as prescribed by §§ 68-3-203(g), 68-3-302 or 68-3-305(b), a complaint to establish parentage may be filed." Tenn. Code Ann. § 36-2-305(b) (2005). In this case, we must also consider the separate statutory procedure for determining parentage. Pursuant to sections 68-3-203(g), 68-3-302, 68-3-305(b) and 24-7-113, the unrevoked voluntary acknowledgment of paternity executed in 2000 constitutes "a legal finding" of Mr. F's paternity; it is "conclusive of that father's paternity without further order of the court," and it is "entitled to full faith and credit in any judicial or administrative proceeding in this state." *See* Tenn. Code Ann. § 24-7-113(a), (b) (2000).

Mrs. F and Mr. S cite ***In re T.K.Y.*** for the notion that "once paternity has been established, the biological father becomes the legal father[.]" 205 S.W.3d at 352. They interpret this language to mean that Mr. S automatically became the legal father of A.N.F. as soon as the independently obtained DNA test established the probability of his paternity. However, we do not read ***In re T.K.Y.*** as commanding that result. The Supreme Court explicitly stated in ***In re T.K.Y.***, "The legal father may or may not be the biological father of a child." ***Id.*** at 351. By statute, a "legal parent" is defined as, among other things, "a man who has been *adjudicated* to be the legal father of the child by any court or administrative body of this state . . . or who has signed, pursuant to §§ 24-7-113, 68-3-203(g), 68-3-302 or 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under the provisions of Tennessee law." Tenn. Code Ann. § 36-1-102(28) (2005) (emphasis added). Therefore, the Supreme Court stated, "the biological father is not automatically the legal father of the child." ***In re T.K.Y.***, 205 S.W.3d at 352. Rather, he becomes the legal father if he "has been adjudicated to be the father[.]" ***Id.*** Absent an adjudicative proceeding, then, the biological father is not given the status of legal father. ***Id.*** Although the Court did state later in the opinion that "once

paternity has been established, the biological father becomes the legal father," the Court clearly envisioned paternity being established *by a court*.

We also conclude that Mr. S is not automatically entitled to a court order adjudicating his paternity, because in this case, the voluntary acknowledgment of paternity is conclusive of Mr. F's paternity of A.N.F. If Mr. S was entitled to be named the legal father, the conclusiveness of the voluntary acknowledgment of paternity and the limited revocation procedures set forth in the voluntary acknowledgment of paternity statute would be meaningless. *See* Tenn. Code Ann. § 24-7-113(a)-(e) (2000). The voluntary acknowledgment statute does not provide that the acknowledgment will be automatically revoked if ever it is discovered that another man is the biological father. Balancing the competing interests when a child's paternity is disputed is essentially a legislative prerogative. **State ex rel. Cihlar v. Crawford**, 39 S.W.3d 172, 184 (Tenn. Ct. App. 2000). Thus, when legislatures have recognized "a conclusive presumption of parentage," even though the man is later determined not to be the biological father, they "were essentially making a public policy statement that the scales should be balanced in favor of preserving the integrity of the family unit." **Id.**

Because Mrs. F and Mr. S did not present sufficient grounds to revoke the voluntary acknowledgment of paternity, it constitutes "a legal finding of paternity on the individual named as the father of the child in the acknowledgment," and it is conclusive of Mr. F's paternity of A.N.F. Tenn. Code Ann. § 24-7-113 (2000). Therefore, the trial court properly dismissed the complaint to establish parentage filed by Mrs. F and Mr. S. Because Mr. S is not legally the parent of A.N.F., we agree with Mr. F that it is not necessary to consider his counter-petition to terminate Mr. S's parental rights.

## C. The Petitions to Modify Custody and Visitation

The original parenting plan provided that when A.N.F. reached school age, Mr. F would be the primary residential parent, and the children would reside with Mrs. F every other weekend and every other Wednesday night. During summer vacation, the opposite schedule would apply, and the children would reside primarily with Mrs. F. In her petition to modify the parenting plan, Mrs. F contended that she should be awarded primary custody of both children based on the DCS investigations of Mr. F, the children's alleged crying fits at visitation exchanges, Mr. F's refusal to answer Mrs. F's telephone calls, and the fact that Mrs. F had obtained employment and a separate residence since the divorce. Mr. F claimed that the parenting plan should be amended to reduce Mrs. F's visitation and require it to be supervised because of her false accusations and derogatory remarks against Mr. F, her inability to cooperate with Mr. F according to the parenting plan, and her alleged emotional instability. The trial court denied Mrs. F's petition and granted Mr. F's petition, limiting Mrs. F to visitation on alternate weekends and alternate holidays, and requiring supervision by "a neutral third party mutually agreeable to the parties."

Existing custody arrangements are favored because children thrive in stable environments. **Kellett v. Stuart**, 206 S.W.3d 8, 14 (Tenn. Ct. App. 2006). A custody decision, once made and

implemented, is considered res judicata upon the facts in existence at that time, or those that were reasonably foreseeable when the decision was made. *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006); *Kellett*, 206 S.W.3d at 14. Still, courts are authorized by statute to alter a custody arrangement as required by intervening circumstances, or "as the as the exigencies of the case may require." *Krupp v. Cunningham-Grogan*, No. M2005-01098-COA-R3-CV, 2006 WL 2505037, at *6 (Tenn. Ct. App. Aug. 29, 2006) (citing Tenn. Code Ann. § 36-6-101(a)(1) (Supp. 2006)). The party petitioning to change the custody order must prove both that a material change in circumstances has occurred and that a change of custody is in the child's best interest. *Kellett*, 206 S.W.3d at 14. The "threshold issue" in cases involving a proposed modification of an existing custody order is whether a material change in circumstances has occurred since the initial custody determination. *Blair v. Badenhope*, 77 S.W.3d 137, 150 (Tenn. 2002).

A "change in circumstance" with regard to the parenting schedule is a distinct concept from a "change in circumstance" with regard to the identity of the primary residential parent. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Tennessee Code Annotated section 36-6-101(a)(2)(B) provides the following instruction regarding changing *custody*, in pertinent part:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. . . . A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Tennessee Code Annotated section 36-6-101(a)(2)(C) then provides the following instruction regarding changing *a residential parenting schedule*, in pertinent part:

> If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. . . . A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

The statute establishes a lower threshold for modifying "the specifics" of a residential parenting schedule than that required to modify more substantive matters such as the designation of the primary residential parent. *Massey-Holt*, 255 S.W.3d at 607.

"Custody decisions often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings." **Joiner v. Griffith**, No. M2004- 02601-COA-R3-CV, 2006 WL 2135441, at *2 (Tenn. Ct. App. July 31, 2006) (citing *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997)). As such, trial courts have broad discretion to fashion custody and visitation arrangements that best suit the unique circumstances of each case. **Id.** (citing *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999)). "It is not the function of appellate courts to tweak a visitation order in the hopes of achieving a more reasonable result than the trial court." **Eldridge v. Eldridge**, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding custody should be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." **Id.** If no error in the trial court's ruling is evident from the record, the ruling must stand. **Id.** In sum, appellate courts are reluctant to second-guess custody decisions when so much depends on the trial court's assessment of the witnesses' credibility, but we will reverse or modify a trial court's custody decision if we conclude the decision rests on an error of law, or if the evidence preponderates against the finding that there has or has not been a material change in the child's circumstances or that the child's interests will be best served by changing an existing custody arrangement. **Scofield v. Scofield**, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *2 (Tenn. Ct. App. Feb. 28, 2007).

### 1.    Mrs. F's Petition Seeking a Change in Custody

First, we will address each of the circumstances cited by Mrs. F in support of her petition to be named primary residential parent of the children.[13] Mrs. F primarily relied on the fact that DCS was investigating Mr. F for alleged abuse or neglect of both children. She detailed the allegations in her petition and noted that Mr. F was limited to supervised parenting time with the children because of the ongoing investigations. Mrs. F contended that this constituted a material change in circumstances justifying a change in custody. The trial court summarized its findings on the matter by stating, "the fact that [Mr. F] was investigated by DCS for frivolous claims made by [Mrs. F], which were later dismissed, does not constitute a material change in circumstances that would warrant a change in custody." We agree. It is clear that the accusations of abuse in this case were taken seriously and investigated thoroughly. DCS conducted full investigations of the allegations involving both children and concluded that no abuse or neglect occurred in either situation. The guardian ad litem reached the same conclusion after his investigation. As the trial court noted, the proof of abuse primarily came from the testimony of Mrs. F and her parents, whom the trial court specifically found "not credible." Although Ms. Austin also testified that during one counseling session, A.N.F. told her she had been touched inappropriately, there was evidence presented to

---

[13] Mrs. F contends that the trial court should have granted her petition to change custody because Tennessee Code Annotated section 36-6-101(a)(2)(C) sets "a very low threshold for establishing a material change of circumstances." *See* **Rose v. Lashlee**, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2, n.3 (Tenn. Ct. App. Aug. 18, 2006). It is true that under section (a)(2)(C), "[m]erely showing that the existing arrangement has proven unworkable for the parties is sufficient to satisfy the material change of circumstance test." **Id.** By its terms, however, section (a)(2)(C) only applies "[i]f the issue before the court is a modification . . . pertaining to a residential parenting schedule," and section (a)(2)(B) applies "[i]f the issue before the court is a modification . . . pertaining to custody." As discussed in **Massey-Holt**, 255 S.W.3d at 607, the statute creates a different standard for each situation.

suggest that Mrs. F had instructed A.N.F. to make such statements.[14] A.N.F. was examined at an emergency room, but no evidence of abuse was discovered. Regarding C.S.F.'s injury, there were several documented reports of various inconsistent and false statements made by Mrs. F, which led to the second investigation of Mr. F. It is undisputed that Mrs. F had falsely reported allegations of abuse in the past. Considering all the evidence in the record, we find that the evidence does not preponderate against the trial court's conclusion that Mrs. F's allegations were, in fact, frivolous. Therefore, we similarly conclude that the fact that Mr. F was being investigated by DCS and was temporarily denied visitation with his children does not constitute a material change in circumstances justifying a change in custody to Mrs. F. "While the existence of physical abuse unquestionably could, and likely would, constitute a material change in circumstances for purposes of changing custody, altogether unfounded allegations most certainly cannot." ***Mulkey v. Mulkey***, No. E2004-00590-COA-R3-CV, 2004 WL 2412610, at *4 (Tenn. Ct. App. Oct. 28, 2004). We have also considered Mrs. F's insinuation that the other injuries suffered by the children while in Mr. F's care were the result of abuse and/or neglect by Mr. F, but we find no support for her assertion.

Next, we consider Mrs. F's contention that "both of the children have stated that they do not want to visit with" Mr. F. The children were ages five and three when Mrs. F filed her petition making this assertion. "A young child's changing wishes about where he or she wants to live do not, by statute or otherwise, create a material change of circumstances." ***Costley v. Benjamin***, No. M2004-00375-COA-R3-CV, 2005 WL 1950114, at *16 (Tenn. Ct. App. Aug. 12, 2005). Once there has been a showing of a material change in circumstances, *then* the stated preference of a child is one of the statutory factors that can be considered by a trial court when determining what is in the best interest of the child. ***Mulkey***, 2004 WL 2412610, at *5 (citing Tenn. Code Ann. § 36-6-106). Even then, however, the court is not required to consider the preference of a child younger than twelve, and courts are instructed to give "greater weight" to the preferences of older children.[15] *See* Tenn.

---

[14] Although Ms. Austin stated that she believed A.N.F.'s statement about the alleged abuse, the trial court apparently discredited Ms. Austin's opinion. The court's findings noted that Ms. Austin received all background information about the allegations of abuse from Mrs. F, she acknowledged that A.N.F. lied to her on at least one occasion during counseling, she did not counsel A.N.F. for the purpose of determining whether the abuse had occurred or for the purpose of conducting a child custody evaluation, and Ms. Austin had never observed A.N.F. with Mr. F. In conclusion, the court found that "the testimony of Ms. Austin does not provide any evidence as to whether or not any sexual abuse occurred, but her testimony does confirm that the child's statement's are, at best[,] not credible." The trial court was not required to accredit Ms. Austin's testimony as an expert witness, even in the absence of contrary expert opinions. Ms. Austin's opinion, like that of any other expert witness, was advisory in nature, and in making its own judgment, the court could give her opinion whatever weight it deemed appropriate in light of the other facts in evidence. ***McClain v. McClain***, No. E2002-00913-COA-R3-CV, 2003 WL 1452958, at *7 (Tenn. Ct. App. Mar. 21, 2003); ***Guill v. Carr***, No. 56-195R2, 1993 WL 476991, at *6 (Tenn. Ct. App. M.S. Nov. 17, 1993); ***Roberts v. Roberts***, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991).

[15] The Middle Section aptly explained the reason for such a rule in ***Costley***:

The statute's differentiation based on the age of the child reflects a legislative judgment that the preferences of younger children are less reliable as guides to their best interest. Whether or not a court chooses to hear from a younger child, or even to consider a child's preferences as a factor in the design

(continued...)

Code Ann. § 36-6-106(a)(7) (2005 & Supp. 2007). We further note that it is not clear from the record that these children would actually prefer to reside with Mrs. F. Mrs. F attempted to testify as to the children's alleged preferences and claimed that the children would cry and "throw fits" at visitation exchanges. However, she later testified that C.S.F. loves Mr. F and is upset when he does not get to visit with him. She also testified that A.N.F. had been throwing fits at exchanges "up until recently." Mrs. F's father, who videotaped every visitation exchange between the parties, acknowledged that the children were not always upset. He also testified that A.N.F. was "not as bad" at exchanges in the past few months, and that C.S.F. is "always proud" to see Mr. F and likes to go with him. Mr. F also testified that the children no longer cry at exchanges, and he accused Mrs. F of coaching them to cry at the previous exchanges. In sum, we find that Mrs. F's contention regarding the children's alleged preferences as to custody does not constitute a material change in circumstances.

The next basis for Mrs. F's petition to modify the custody arrangement was that Mr. F had failed to adhere to various provisions of the parenting plan. She alleged that Mr. F was not allowing her at least two telephone calls per week with the children. At trial, Mrs. F introduced cassette tape recordings of messages she left for Mr. F, but as the trial court noted in its findings, there was nothing to indicate whether her calls were returned. Mrs. F also claimed that Mr. F failed to provide health insurance for the children, but the court found that their lack of coverage was not due to Mr. F's inaction. The court found that A.N.F.'s TennCare coverage was suspended because "the State of Tennessee learned that [Mrs. F] was drawing food stamps on [A.N.F.] when she did not have full custody of the child." The court specifically credited Mr. F's testimony that he was actively seeking to reinstate TennCare coverage for A.N.F. After addressing these alleged violations and others, the court found that the allegations did not rise to the level necessary to constitute a material change in circumstances that warranted changing custody to Mrs. F. The evidence presented does not preponderate against the trial court's conclusion.

Finally, Mrs. F contended that a material change in circumstances had occurred because since the divorce, she had secured employment, obtained a car, and moved from her parents' house to a separate trailer owned by her father located next to her parents' house. By the second day of trial, however, Mrs. F was again unemployed. The trial court concluded that Mrs. F failed to show how these changes impacted the children "in any manner, much less a material manner." We agree with

[15](...continued)
of a parenting arrangement, there is nothing in the applicable statutes indicating changing preferences could constitute a material change of circumstances.

A young child's changing wishes about where he or she wants to live do not, by statute or otherwise, create a material change of circumstances. Children can easily decide they would rather live with the more lenient or generous parent rather than the one who just refused to buy the newest must-have item or who set rules the child did not agree with. Neither the legislature nor the courts want to encourage parents to seek modification of custody on the sole basis of a child's shifting preferences in the absence of a real change of circumstances that affects the wellbeing of the child.

*Costley*, 2005 WL 1950114, at *16.

the trial court. A parent's change in circumstances may be a material change in circumstances for the purposes of modifying custody *if* such a change affects the child's well-being in a meaningful way, but Mrs. F has not demonstrated that these changes in her life affected her children in a way that justifies a change in custody. *See Caldwell v. Hill*, 250 S.W.3d 865, 870-72 (Tenn. Ct. App. 2007) (discussing the burden of proof required to establish a material change in circumstances). None of the circumstances cited by Mrs. F, considered alone or taken together, necessitates removing custody from Mr. F and granting custody to Mrs. F.

### 2. Mr. F's Petition to Restrict Mrs. F's Visitation

In Mr. F's petition to modify the parenting plan, he claimed that Mrs. F should be awarded less visitation, and it should be supervised, because of her alleged false accusations and derogatory remarks against Mr. F, her inability to cooperate with him according to the parenting plan, and her alleged emotional instability. The trial court granted Mr. F's petition upon finding that it was in the best interest of the children for Mrs. F to have less visitation, supervised by a "neutral third party mutually agreeable to the parties."

On appeal, Mrs. F contends that the trial court was prohibited from modifying the parenting plan in any way based on Mrs. F's reporting of allegations of abuse, citing Tennessee Code Annotated section 36-6-112(c), also known as the "Protective Parent Reform Act." The statute provides:

> If a parent makes a good faith allegation based on a reasonable belief supported by facts that the child is the victim of child abuse, child neglect, or the effects of domestic violence, and if that parent acts lawfully and in good faith in response to that reasonable belief to protect the child or seek treatment for the child, then that parent shall not be deprived of custody, visitation, or contact with the child, or restricted in custody, visitation, or contact, based solely on that belief or the reasonable actions taken based on that belief.

Tenn. Code Ann. § 36-6-112(c) (Supp. 2007). We would agree with Mrs. F if the record demonstrated that she acted "in good faith in response to [a] reasonable belief" that the children were victims of child abuse or neglect. However, the trial judge concluded that Mrs. F's reports of sexual abuse were "absolutely false," and that she "knowingly lied" to the doctors and nurses regarding C.S.F.'s leg injury. As discussed above, the record supports the trial court's conclusion that Mrs. F's allegations were frivolous and intended to deprive Mr. F of custody of the children. Therefore, Mrs. F cannot claim the protection of the Protective Parent Reform Act. *See Agee v. Agee*, No. W2007-00314-COA-R3-CV, 2008 WL 2065996, at *7-8 (Tenn. Ct. App. May 16, 2008) (rejecting the argument that the Protective Parent Reform Act prohibited a change in custody when one parent continued to *falsely* accuse the other parent of sexually abusing the child); *see also Keisling v. Keisling*, 196 S.W.3d 703, 722-23 (Tenn. Ct. App. 2005) (rejecting the argument that repeated false accusations of child sexual abuse cannot constitute a material change in circumstances). We find no error in the trial court's ruling that a material change in circumstances had occurred to justify a

reduction in Mrs. F's visitation to alternating weekends and the alternating holidays provided in the parenting plan.

Mrs. F also argues that the trial court should have awarded her at least some visitation time with the children during breaks from school for Christmas, spring, and summer vacation. The provisions of the parenting plan addressing Spring and Summer vacation were left blank. The parenting plan's holiday schedule does not list Christmas, but it does provide that "Other School-Free Days" would be split between the parties. In the proposed parenting plan presented by Mr. F, he submitted that the parties should alternate visitation time during the Christmas holidays and also divide any Spring vacation time from school. Nevertheless, the trial court did not award Mrs. F any visitation during those times. We find that Mr. F's proposal as to visitation was reasonable, and we modify the permanent parenting plan to include the provisions he suggested:

> The parties shall alternate the Christmas holidays as follows: In even years, the mother shall have the minor children from the time school dismisses until 2:00 p.m. on Christmas Day and the father shall have the children from 2:00 p.m. on Christmas Day until school resumes, at which time, the residential parenting time as set forth in Section [I.B. of the parenting plan ordered by the court] shall apply. In odd years, the father shall have the minor children from the time school dismisses until 2:00 p.m. on Christmas Day and the mother shall have the children from 2:00 p.m. on Christmas Day until 6:00 p.m. the night before school resumes.
> . . . .
> The parents will also divide any Spring school vacation.

We will not alter the trial court's decision to eliminate Mrs. F's lengthy summer visitation with the children, which had been provided pursuant to the original parenting plan entered when the parties divorced.

Next, we must address the issue of supervised visitation. Mrs. F argues that there is no need for her visitation to be supervised because there was no evidence presented that she is a threat to the children's safety. A decision regarding supervision "stems from the delicate balancing of protection of the child with preservation of the child's relationship with her parent, [and] we are compelled to recognize that such decisions hinge on the trial court's assessment of the parties' credibility, specifically, whether the parent can be trusted to spend time alone with the child without violating the necessary boundaries." *B.M.M. v. P.R.M.*, M2002-02242-COA-R3-CV, 2004 WL 1853418, at *18 (Tenn. Ct. App. Aug. 18, 2004). Although "we accord appropriate deference to the trial court's assessment of the witnesses' credibility, we are also obliged to examine the record independently and review the trial court's decisions carefully." *Id.* at *19. In other words, the general rule is that the details of custody and visitation are peculiarly within the broad discretion of the trial judge, but on appeal, "we must remember that the welfare of the child has always been the paramount consideration." *Bueno v. Todd*, No. W2005-02164-COA-R3-CV, 2006 WL 2106006, at *5 (Tenn. Ct. App. 2006).

A parent's right to visit with his or her children is not absolute, and "courts may restrict, suspend, or terminate visitation rights upon the presentation of clear and definite evidence that permitting continued visitation will jeopardize the child physically, emotionally, or morally." **Bueno**, 2006 WL 2106006, at *5 (quoting *Wix v. Wix*, No. M2000-00230-COA-R3-CV, 2001 WL 219700, at *10 (Tenn. Ct. App. Mar. 7, 2001)); *see also* **Eldridge**, 42 S.W.3d at 85. The best interest of the child may require that the trial court place restrictions on, limit, or prohibit visitation. **In re S.C.H.**, No. M2003-01382-COA-R3-CV, 2004 WL 2941151, at *4 (Tenn. Ct. App. Dec. 20, 2004). Supervision is sometimes necessary in order to protect the child, yet permit the continuation of visitation. **B.M.M.**, 2004 WL 1853418, at *18. However, "supervision of a parent's visitation with his or her child is a significant intrusion on the parent-child relationship," and the decision to require supervision should not be undertaken lightly or without a reasonable basis. **Id.** The right of the non-custodial parent to reasonable visitation is clearly favored. **Bueno**, 2006 WL 2106006, at *5 (citing *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)). "Tennessee's courts have repeatedly recognized that custody and visitation arrangements should interfere with the parent-child relationship as little as possible." **Id.** (quoting *Wix*, 2001 WL 219700, at *10).

"Because of the legal and psychological significance of a parent's visitation rights, persons seeking to restrict or eliminate visitation must demonstrate that there is probable cause that the child will be placed at risk if visitation is permitted." **Bueno**, 2006 WL 2106006, at *6 (quoting *Wix*, 2001 WL 219700, at *11). Tennessee Code Annotated section 36-6-301 provides, in relevant part:

> After making an award of custody, the court shall, upon request of the non-custodial parent, grant such rights of visitation as will enable the child and the non-custodial parent to maintain a parent-child relationship unless the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health. . . . If the court finds that the non-custodial parent has physically or emotionally abused the child, the court may require that visitation be supervised or prohibited until such abuse has ceased or until there is no reasonable likelihood that such abuse will recur.

Tennessee Code Annotated section 36-6-406 further provides, in part:

> (a) . . . [A] parent's residential time as provided in the permanent parenting plan . . . shall be limited if it is determined by the court, based upon a prior order or other reliable evidence, that a parent has engaged in any of the following conduct:
> (1) Willful abandonment that continues for an extended period of time or substantial refusal to perform parenting responsibilities; or
> (2) Physical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-3-601.
> . . . .
> (d) A parent's involvement or conduct may have an adverse effect on the child's best interest, and the court may preclude or limit any provisions of a parenting plan, if any of the following limiting factors are found to exist after a hearing:
> . . . .

-28-

(5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development;
(6) A parent has withheld from the other parent access to the child for a protracted period without good cause;
. . . .
(8) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

These statutes have effectively created "a presumption against severely circumscribing or denying visitation to noncustodial parents." *Bueno*, 2006 WL 2106006, at *6 (quoting *Wix*, 2001 WL 219700, at *11). Drastic measures are appropriate only when other arrangements less detrimental to the parent-child relationship are not available or workable as a practical matter. *Id.* The least restrictive visitation limits are favored in order to encourage the parent-child relationship. *In re Z.A.W.*, No. W2005-01956-COA-R3-JV, 2006 WL 1627180, at *5 (Tenn. Ct. App. Jun. 12, 2006). "Applicable legal standards require that restriction, curtailment, or elimination of visitation rights must be based on specific findings, resulting from clear and definite evidence, that one of the situations justifying such action exists." *In re S.C.H.*, 2004 WL 2941151, at *5.

Here, the trial court concluded that Mrs. F's allegations of sexual abuse against Mr. F were "absolutely false," yet she "even went so far as to subject her five year old child to an examination for evidence of sexual abuse knowing no such abuse had occurred. The court [found] such conduct was not only unnecessary and cruel but endangered the physical and emotional well-being of the minor child and shows a reckless disregard for the welfare of the child." Regarding Mrs. F's false statements following C.S.F.'s leg injury, the court found that her behavior "was intended to destroy the children's relationship with their Father" without regard to "how such false accusations would hurt the children." The court concluded that Mrs. F had repeatedly used false allegations "in an effort to torment Father and use the children as pawns in the parties' ongoing conflict," and that her behavior was "in complete disregard for the best interest of the minor children." The trial court found that Mrs. F "will say or do anything to destroy the minor children's relationship with [Mr. F] for her own selfish gain." The court also addressed the fact that Mrs. F simply introduced Mr. S to A.N.F. as her biological father, "shattering the child's understanding of her relationship with [Mr. F] and introducing her to a man she never knew." On this subject, the court's findings were as follows:

> The Court finds that [Mrs. F's] actions were intended solely to hurt [Mr. F] and further her chances of gaining custody of the children at trial. [Mrs. F] did not offer any evidence of securing counseling for the child concerning this revelation, nor did she appear to consider the emotional ramifications that such life-altering information would have on such a young child. The Court finds that [Mrs. F] will stop at nothing to ensure that the children are not allowed to have a healthy, peaceful, and loving relationship with [Mr. F], and that such behavior is not in the best interest of the children and represents a material change in circumstance such that the present custody order of this court should be modified to restrict the visitation and/or custody rights of [Mrs. F]. The Court further finds that such introduction endangered the

emotional well-being of the minor child, and demonstrates [Mrs. F's] gross inability to contemplate the children's best interests when it comes to their relationship with [Mr. F].

. . . .

In essence, [Mrs. F] is so childish and shows such a disregard for the minor children's welfare that she is willing to use the minor children as a pawn to get her way and hurt [Mr. F]. This is certainly not behavior which facilitates or encourages a strong relationship between a parent and child.

In sum, the court found that Mrs. F's "collective bad behavior" since the final decree of divorce constituted a material change in circumstances. Based upon this finding, the court ordered that Mrs. F's visitation be supervised at all times by "a neutral third party mutually agreeable to the parties, or in the event the parties cannot agree by [blank]."

We recognize that accusations of child sexual abuse by one parent against the other parent present one of the most difficult issues faced by a trial court. *Keisling v. Keisling*, 196 S.W.3d 703, 722 (Tenn. Ct. App. 2005). Allegations of abuse provoke strong reactions to condemn the alleged perpetrator and to protect the child, and this desire to protect the child may lead many well-motivated persons to presume that the allegations are true until proved otherwise. *Guill v. Carr*, No. 56-195R2, 1993 WL 476991, at *4 (Tenn. Ct. App. M.S. Nov. 17, 1993) (citing *Crabtree v. Crabtree*, 716 S.W.2d 923, 926 (Tenn. Ct. App. 1986)). Suspicions of such abuse must be taken seriously and investigated thoroughly, for the consequences to the child of allowing any abuse to continue are grave. *Keisling*, 196 S.W.3d at 722. "However, mistakenly concluding that a parent has abused his child, when in fact there has been no abuse, has serious consequences as well, including the almost-certain destruction of the parent-child relationship and disgrace to the accused parent." *Id.* Sexual abuse allegations "have proved to be a potent adversarial weapon whether substantiated or not, and regrettably parties have abused the allegation itself by falsely accusing their estranged or former spouses in order to gain some tactical advantage." *Guill*, 1993 WL 476991, at *4. Therefore, "any concern about reporting allegations of child sexual abuse must be balanced with the awareness that false accusations of such abuse can be a 'reprehensible tool' against an ex-spouse, remarkable for its 'brutal effectiveness.'" *Keisling*, 196 S.W.3d at 722. Harm can result to a child "when a parent's natural and expected protectiveness regarding the prospect of sexual abuse by the other parent goes beyond reason, becoming obsessive hypervigilance." *Id.* at 723. If the parent is permitted to continue such conduct, "the consequence can be lasting psychological damage to the child and the destruction of a normal parent-child relationship." *Id.* (citing *B.M.M. v. P.R.M.*, M2002-02242-COA-R3-CV, 2004 WL 1853418 (Tenn. Ct. App. Aug. 18, 2004)).

In this case, we sympathize with the trial court and recognize its frustration in dealing with the troubling situation Mrs. F needlessly created. Because of Mrs. F's false allegations against Mr. F, he was limited to supervised visitation with one or both of the children for just over a year while the investigations were pending. As discussed above, we agree with the trial court's conclusion that Mrs. F's behavior constitutes a material change in circumstances that justified reducing her parenting time with the children. Nevertheless, we conclude that the circumstances of this case do not justify

a further restriction on Mrs. F's visitation requiring supervision at all times. Custody and visitation decisions are difficult, but "[r]ather than calling for heavy handed, authoritarian intervention, they require trial courts to exercise compassionate and practical judgment to devise an arrangement that will promote the continuation and development of the child's relationship with both parents." **Wix v. Wix**, No. M2000-00230-COA-R3-CV, 2001 WL 219700, at \*9 (Tenn. Ct. App. Mar. 7, 2001) (citations omitted). Custody and visitation decisions are not intended to reward or punish parents, and visitation should not be granted or withheld for punitive purposes. **Id.**; *see also* **Massey-Holt v. Holt**, 255 S.W.3d 603, 610-11 (Tenn. Ct. App. 2007). Here, the burden of securing supervision at all times by "a neutral third party mutually agreeable to the parties" would be difficult to bear considering that Mrs. F was awarded overnight visitation with the children every other weekend. We note that Mrs. F's motion to alter or amend alleged that the parties were unable to agree on a suitable party to supervise her visitation because Mr. F would not approve of supervision by Mrs. F's parents. There is no suggestion that Mrs. F would physically harm the children, and although we agree with the trial court that Mrs. F was not acting in the best interest of the children by repeatedly lying about Mr. F and keeping the children from him, it appears that there are less drastic alternatives to controlling her behavior than requiring supervised visitation. We sincerely hope that the new parenting plan's reduction in Mrs. F's visitation will signal to Mrs. F that continued interferences with Mr. F's rights under the parenting plan may result in further restrictions on her parenting time. Alternatively, Mr. F has the option of invoking the trial court's contempt powers if Mrs. F willfully fails to comply with the parenting plan. The first paragraph of the new parenting plan provides, in emphasized language, that both parents "will behave with each other and each child so as to provide a loving, stable, consistent and nurturing relationship with the child even though they are divorced. They will not speak badly of each other or the members of the family of the other parent. They will encourage each child to continue to love the other parent and be comfortable in both families." Both parties are given the right "to be free of unwarranted derogatory remarks." We would advise Mrs. F to comply with these provisions and behave in a manner consistent with the children's best interest, which means facilitating and encouraging the children's relationship with Mr. F. If she does not, the trial court can and should take further action to address the situation.

In conclusion, we affirm the trial court's finding that a material change in circumstances had occurred to justify reducing Mrs. F's parenting time as provided in the new parenting plan. However, we modify the parenting plan to include the aforementioned provisions regarding Christmas and Spring vacation, and we remove the requirement that Mrs. F's parenting time must be supervised.

### D.    *Attorney's fees*

Mrs. F contends that she should be awarded the attorney's fees she incurred in the trial court and on appeal pursuant to Tennessee Code Annotated section 36-5-103 because this case involves child custody. The statute vests discretionary authority in the court to award such fees in custody cases. **Shofner v. Shofner**, 181 S.W.3d 703, 719 (Tenn. Ct. App. 2004). "In determining whether an award for attorney's fees is warranted, we should consider, among other factors, the ability of the requesting party to pay his or her own attorney's fees, the requesting party's success on appeal, and

whether the requesting party has been acting in good faith." ***Id.*** (citing *Parchman v. Parchman*, No. W2003-01204-COA-R3-CV, 2004 WL 2609198, at *6 (Tenn. Ct. App. Nov.17, 2004)). We review the trial court's decision using the less stringent "abuse of discretion" standard of review. ***Richardson v. Spanos***, 189 S.W.3d 720, 729 (Tenn. Ct. App. 2005). In this case, we find no abuse of the trial court's discretion in declining to award Mrs. F her attorney's fees, and we find it equitable to decline to award Mrs. F attorney's fees on appeal.

## V.   Conclusion

For the aforementioned reasons, we affirm the decision of the trial court as modified. Costs of the appeal in the paternity case are taxed to the appellants, Mrs. F and Mr. S, and their surety, for which execution may issue if necessary. Costs of the appeal in the custody case are taxed to Mrs. F, and her surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.